**Affirmed and Opinion filed April 19, 2016.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00427-CR

---

**NARJES MODARRESI, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1260243**

---

## O P I N I O N

A jury convicted appellant, Narjes Modarresi, of capital murder. The State did not seek the death penalty, and thus the trial court assessed a mandatory sentence of life imprisonment without parole. *See* Tex. Penal Code Ann. § 12.31(a)(2) (West Supp. 2015). On appeal, appellant contends the evidence is insufficient to support the conviction and that the trial court erred by denying appellant's motion to declare unconstitutional the statute mandating her sentence and by denying her motion for new trial. We affirm.

# I. BACKGROUND

Appellant was charged with capital murder for killing her two-month-old son, Masih Golabbakhsh ("Masih"), by placing him "face down in the mud." At trial, appellant did not dispute she killed Masih in the manner alleged but claimed that due to her mental illness, she did not intentionally or knowingly kill him, as required to prove the offense. *See id.* § 19.02(b)(1) (West 2011).

## A.    Evidence regarding the Offense

At the time of the offense, appellant and her husband, Amir Golabbakhsh ("Amir"), lived in Houston with their two children, Masih and a three-year-old son, and Amir's parents. On the afternoon of April 21, 2010, while the men were away from home, appellant told her mother-in-law that appellant was taking Masih to visit appellant's friend. Appellant left on foot with Masih in a stroller. The mother-in-law noticed that appellant walked in a different direction than she should take to the friend's house, but the mother-in-law resumed her activities at the home.

At about 4:00 p.m., Jessica Shaver was sitting on the porch of her home near the Buffalo Bayou when she saw appellant walking down the street pushing a stroller with a baby carrier attached. Appellant then began to run, slammed the apparatus into a curb causing the stroller and carrier to separate, and ran away without those items. Shaver thought she was witnessing abandonment of a baby. She and a passerby unrolled a blanket that had fallen out of the stroller but found only a pillow. Shaver drove around looking for appellant but did not see her.

Meanwhile, Rebecca Pike was visiting the home of appellant's friend when appellant knocked on the door and was upset. Although appellant spoke with her friend partially in Farsi (their native language), Pyke understood from appellant's

2

statements in English that she was saying someone took her child. Based on information obtained from appellant, Pyke relayed to a 911 operator that two black men took the child.

Appellant reported to the first responding officer that she was walking by a park when a black man pushed her down, took the baby, and entered a car driven by another black man. Appellant provided descriptions of the car and the man who allegedly took the baby. At some point, appellant called her mother-in-law, who went to the area where appellant was with the police officer. When the mother-in-law asked what happened, appellant reiterated her claim that Masih had been kidnapped by two black men. However, according to Shaver, no black man approached appellant or took a baby when appellant slammed the stroller and ran away.

The officer drove appellant and her mother-in-law to the location where appellant said the kidnapping occurred. The officer became suspicious of appellant's account because (1) the officer had spoken with Shaver, (2) appellant had mud on her clothes, but the area of the alleged kidnapping was not muddy, and there was no indication anyone fell there, and (3) the officer questioned why appellant went to her friend's home farther away rather than seeking help next to the site. The officer called the homicide division, which handles kidnappings.

When a detective arrived, appellant again reported that two black men took the baby. That detective also became suspicious because appellant would interject into the account, "you do believe me?" The detective told appellant the baby might still be alive and asked her to reveal his location. Appellant nodded and began walking toward the bayou but then shortly stopped and said, "but I told you that the black guys took it." The detective arranged for appellant's transportation

3

to the police station for a statement. Additionally, Amir and his father arrived at the scene, an officer searched the area, and an Amber Alert issued.

That night, another detective, Phil Waters, and Officer Tony Jafari (who speaks Farsi) conducted on videotape at the station what they characterized as a non-custodial interview, with the goal of finding Masih.[1] For several hours, appellant maintained the baby was kidnapped, although the officers confronted her with inconsistencies and urged her to reveal the baby's location because he could still be alive. However, after midnight, appellant finally showed the officers where to find Masih. His dead body was near the bayou, face down in muddy water and covered in leaves and mud. His clinched fists grasped mud and debris, indicating to the officers that he had struggled. To reach the area where the body was found, one was required to climb over a barricade marking a dead-end street and a chain marking private property and then descend an embankment. The medical examiner who performed the autopsy determined the cause of death was drowning in muddy water. The medical examiner found a significant amount of mud and silt deep in the lungs which he opined was consistent with Masih having taken multiple breaths while face down in the mud.

After the body was found, appellant was arrested. Thereafter, Detective Waters and Officer Jafari conducted a custodial interview, also videotaped, during which appellant admitted placing Masih face down in the mud and covering him with mud.

## B. Evidence regarding appellant's mental state

Both the State and appellant presented evidence regarding appellant's mental

---

[1] In that interview and a subsequent one, appellant alternated between speaking English and Farsi. Transcripts admitted at trial included the English translations of the portions in Farsi.

4

state relative to whether she intended to kill Masih.[2]  It was undisputed that appellant has Bipolar Disorder and was in a state of post-partum depression when she killed Masih.  However, the State theorized that appellant intentionally killed Masih because, due to that condition, she did not want him.  In contrast, appellant urged that she suffered a psychotic episode associated with her Bipolar condition that negated intent to kill.

The State presented testimony from Amir and his parents and appellant's medical records, in addition to the above-cited evidence regarding the offense and appellant's statements.  Appellant relied on those medical records and presented testimony from her brother and two psychiatrists who treated her before and after Masih's death, respectively.  Appellant also proffered expert testimony from a non-treating psychiatrist, and the State presented a rebuttal expert. The evidence collectively showed the following regarding appellant's mental health relative to the intent issue.

Appellant was treated in Iran for Bipolar Disorder beginning in her late teens.  In 2005 (when appellant was in her mid-twenties), she had an "arranged marriage" to Amir in Iran, their native country, and they moved to Houston where Amir and his parents already lived.  In February 2007, shortly after the birth of the couple's first child, appellant was treated for mental illness in the United States. Specifically, appellant had what psychiatrists classified as a manic episode with psychotic features, associated with Bipolar I Disorder.  Her behavior included chasing cars, crawling like a child, being irrational, agitated, paranoid someone would harm her child, and having grandiose delusions.  Appellant was hospitalized in a psychiatric ward for almost a month and treated with medications.  After her

---

[2] Appellant did not raise insanity as an affirmative defense.  *See* Tex. Penal Code Ann. § 8.01(a) (West 2011).  The evidence regarding mental illness was presented relative to whether she possessed the culpable mental state, as an element of the offense.

5

release, she continued that treatment under Dr. Vasantha Janarthanan, a psychiatrist at the Harris County Mental Health Mental Retardation Authority ("MHMRA")—one of the physicians whom appellant called to testify. Appellant's condition improved to the extent that she functioned well until late 2008, when she had a major depressive episode, and the doctor added an anti-depressant.

In 2009, appellant became pregnant with Masih while she and Amir were visiting Iran. Appellant did not want the pregnancy and unsuccessfully attempted to abort via medication prescribed by her physician aunt. Eventually, the couple flew home to Houston. At that point, appellant was not taking psychiatric medications due to potential effects on the fetus. On the first leg of their flight, appellant had another manic psychotic episode during which she kicked her feet uncontrollably, alternated between crying and laughing, and was agitated and screaming. After their plane landed in Qatar, she was hospitalized for several days and treated with medication. When appellant returned to the United States, Dr. Janarthanan switched appellant to a medication that would not harm the fetus. Appellant improved for a time but then became very depressed during the weeks before Masih's birth.

When Masih was born, appellant had no interest in him and essentially gave him over to her mother-in-law's care while appellant mostly slept. However, Amir never saw appellant having any hallucinations, delusions, or the strange behavior she had exhibited after the first child's birth and during the airplane incident. Shortly before Masih's death, appellant expressed her wish to take both children and go to Iran although Amir needed to remain in Houston. Amir refused this request but said it might become possible if appellant proved she was capable of caring for herself and the children. Appellant was sad and persistent about wanting to go to Iran.

When appellant's brother visited after Masih's birth, he also observed appellant was sleeping a lot but not hearing voices or exhibiting erratic behavior. The brother believed appellant was generally unhappy because she was "micromanaged" by her father-in-law, wanted more freedom like she had enjoyed in Iran, and wanted to go home to Iran.

Before and after Masih's birth, Dr. Janarthanan made various adjustments to appellant's medication, attempting to address the increasing depression. Dr. Janarthanan last saw appellant five days before Masih's death, when appellant had slightly improved but still had "major" depression. However, Dr. Janarthanan saw no apparent psychosis—at that point, appellant denied having any hallucinations, delusions, unusual thought content, mood swings, or manic symptoms—and the doctor detected she was alert with "grossly intact" cognition and "fair" insight and judgment. At that visit, appellant was focused on returning to Iran, and the doctor noted her conflict with Amir over that issue.

By the day of Masih's death, the family perceived appellant was somewhat better due to her desire to prove she could take the children to Iran, which is why they permitted her to take Masih to purportedly visit appellant's friend. Earlier that day, appellant brought an item to Amir at his school, and she seemed fine emotionally and physically. Amir's first contact with appellant after Masih's death occurred the day the infant's body was found, when appellant was incarcerated in a psychiatric facility. Appellant was not emotional or acting strangely and told Amir she killed Masih because he was a burden on Amir's mother, which Amir's family denied. In post-arrest visits with both Amir and her father-in-law, appellant did not cry about Masih.

During her first statement to the police officers, while maintaining Masih was kidnapped, appellant acknowledged she had been depressed since the child's

birth, felt it was a burden for her mother-in-law to care for the baby, and wanted to go to Iran, which her husband would not permit. Appellant also expressed concern about her father-in-law, whom she described as strict and displeased that she suffered from mental illness but became pregnant with Masih.

In appellant's subsequent custodial statement, wherein she confessed to killing Masih, she added details relative to the intent issue: (1) after placing Masih in the mud, appellant threw her wedding anniversary ring, (2) she decided on her actions while lying in bed for hours until early afternoon on the day of the incident because she was depressed and "tired of my situation," and (3) she concocted the story about kidnappers because she knew her actions were wrong and needed some explanation for the family regarding Masih's whereabouts. Further, appellant expressed concern about how her family and friends would view her actions but no remorse about the baby's death.

Within 36 hours after the offense, a counsellor and a psychiatrist evaluated appellant at a psychiatric facility where she was taken from the police station, and another psychiatrist evaluated appellant when she was booked into jail. The psychiatrists observed no psychotic symptoms, and to one such doctor, appellant denied having delusions, hallucinations, or manic symptoms. Additionally, to one such doctor, appellant added that after placing Masih in the mud, she left the area once he became motionless.

Then, another psychiatrist with MHMRA, Debra Osterman, also evaluated appellant within 48 hours after Masih's death and saw appellant every day for the next two years. Dr. Osterman testified appellant's Bipolar I Disorder was "mixed episode severe with psychotic features," meaning she was severely ill with mania and depression at the same time. Dr. Osterman explained that a person in a mixed episode who becomes energetic from the mania may act on the very depressed

8

thoughts and suggested appellant was in such a state when she killed Masih. Dr. Osterman acknowledged appellant did not have hallucinations or delusions during the initial evaluation. But, Dr. Osterman nonetheless opined appellant was "subtly psychotic" because of "disorganized thinking"—on a questionnaire, she denied previously having unusual behavior, which was inconsistent with her history, including the airplane incident. Further, appellant told Dr. Osterman that appellant did not want Masih, she was "tired" of her "situation," the baby was a burden on her family, she previously told Amir the baby should have died at birth, and she wanted to "get rid" of the baby. Dr. Osterman maintained that "get rid" of the baby did not mean appellant wanted him dead.

Appellant's expert, Dr. David Self, met with appellant on several occasions and reviewed her medical records and the police interviews. Dr. Self agreed that appellant has Bipolar Disorder. Dr. Self characterized appellant as feeling "trapped" at the time of Masih's death: she had to live with her in-laws; she thought her father-in-law was controlling and critical; she wanted to go home to Iran; and due to cultural norms, she was expected to be subservient to the men in her household and felt shame about the mental illness. Dr. Self acknowledged appellant did not have hallucinations or delusions that told her to kill Masih. However, Dr. Self opined appellant experienced an "emotional psychosis" in terms of depression so severe that it caused the distorted thought that killing Masih was the only way to escape appellant's situation. But, Dr. Self also agreed that appellant "knew what she was doing" when she put Masih in the mud and waited for him to stop moving because she wanted him out of her life.

The State's expert, Mark Moeller, reviewed the same materials as did appellant's expert and interviewed appellant and her family members. During Dr. Moeller's interview, appellant added that in the baby stroller, she took a scarf to

9

possibly use as a gag for the baby and a spoon which she later used to dig the hole in which she placed the baby. Appellant denied having any hallucinations, delusions, or abnormal behaviors "as things led up to" Masih's death. Dr. Moeller agreed that appellant has Bipolar I Disorder and experienced severe post-partum depression after Masih's birth. But, Dr. Moeller opined the post-partum condition lacked psychotic features and appellant was not psychotic or "out of touch with reality" at the time of the offense. Dr. Moeller also testified he had never heard the term "emotional psychosis" used by Dr. Self and disagreed that such term accurately described appellant's state when she killed Masih. Instead, because appellant's thoughts at that time were logical and goal-oriented, Dr. Moeller concluded that appellant retained the ability to make a decision other than killing her baby.

## II. SUFFICIENCY OF THE EVIDENCE

We first address appellant's third issue, challenging sufficiency of the evidence to support the conviction. When reviewing sufficiency of the evidence, we view all evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). This standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* The trier of fact may choose to believe or disbelieve any portion of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

Under the law applicable to appellant's case, a person commits capital murder if he "intentionally or knowingly causes the death of" an individual under

the age of six. *See* Tex. Penal Code Ann. § 19.02(b)(1) (defining murder); Act of June 17, 2005, 79th Leg., R.S., ch. 428, § 1, 2005 Tex. Gen Laws 1129 (current version at Tex. Penal Code Ann. § 19.03(a)(8) (West Supp. 2015) (elevating murder to capital murder when victim is under age of six).[3] As discussed below, we conclude the evidence is sufficient to establish appellant "intentionally" killed Masih. "A person acts intentionally, or with intent, with respect to . . . a result of [her] conduct when it is [her] conscious objective or desire to . . . cause the result." Tex. Penal Code Ann. § 6.03(a) (West 2011). To determine whether intent existed, the jury may consider events before, during, and after the offense and may infer intent from the acts, word, and conduct of the defendant. See *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.).

In her brief appellate argument, appellant asserts the evidence is insufficient to establish intent to kill Masih because it shows "only that she was suffering from severe mental illness and hallucinations that told her to get rid of it." However, the jury heard evidence negating that claim and establishing intent to kill the baby.

There was ample evidence that despite appellant's past psychotic episodes, she was not hallucinating or otherwise in a psychotic state when she killed Masih: (1) she was lucid and exhibited no psychotic symptoms, including hallucinations, during her interaction with family members shortly before the killing or with family members, police officers, and other witnesses shortly after the killing; (2) appellant had no such symptoms when she saw Dr. Janarthanan six days before the killing or during the psychiatric evaluations within 36 hours after the killing; (3) although an additional psychiatrist, Dr. Osterman, testified appellant was "subtly

---

[3] The statute has since been amended to include when the victim is under the age of ten. *See* Tex. Penal Code Ann. § 19.03(a)(8).

11

psychotic" as exhibited by "disorganized thinking" during her evaluation shortly after Masih's death, appellant was not hallucinating at that time; (4) appellant told the State's expert, Dr. Moeller, she did not have hallucinations before Masih's death; and (5) even appellant's own expert, Dr. Self, agreed the killing did not result from hallucinations. Thus, the jury was free to disbelieve Dr. Osterman's suggestion that appellant experienced a manic psychotic episode or that she was hallucinating when she killed Masih.

As mentioned above, it was undisputed that appellant was in a major-depression phase of her Bipolar Disorder at the time of Masih's death. However, the jury reasonably could have concluded, as argued by the State, that the condition drove, rather than destroyed, the intent: (1) appellant killed Masih because due to her depression and dissatisfaction with her home life, she did not want the baby and viewed him as a burden to her and her family—as she admitted to Amir and the police, and even Dr. Self confirmed; and (2) such feelings were fueled by appellant's frustration that Amir would not permit appellant to return to Iran, as indicated by appellant focusing on that conflict right before the killing and throwing her anniversary ring after the killing. In this regard, the jury was free to reject Dr. Osterman's attempt to distinguish appellant's expressed wish to "get rid" of Masih from a desire to kill him. As Detective Waters testified, and the jury could have gleaned from the transcript and recording of the custodial interview, appellant "very calmly and with a lot of composure" detailed why she placed Masih in the mud alive and "her intent was very clear."

With respect to appellant's depression, Dr. Self's opinion regarding psychosis at the time of the offense was somewhat different than Dr. Osterman's suggestion. As mentioned above, Dr. Self seemed to opine that, rather than experiencing classic psychotic features, appellant's "emotional psychosis" was

12

severe depression making her believe killing Masih was the only way to escape her situation. However, the jury could have rejected that opinion while accepting the portion of Dr. Self's testimony indicating appellant killed Masih to eliminate him from her life. The jury could have concluded, consistent with Dr. Moeller's opinion, that appellant chose such action as one method to escape; or even if she considered such action as the only escape, she nonetheless intended to kill Masih.

Besides appellant's admissions, her other words and actions surrounding the offense negated that the killing resulted from a psychotic episode, including hallucinations, or from depression precluding the ability to form intent; they showed clear thought in planning, executing, and hiding the killing: (1) appellant told her mother-in-law she planned to visit a friend but immediately went in a different direction; (2) she took the scarf and spoon to further commission of the offense; (3) she committed the offense in an area that was difficult to reach and not in plain site; (4) it is a rational inference that an adult would know that placing a two-month-old infant face down in muddy water would cause the infant's death and that there was no reason to place the infant in that position other than to cause death; (5) appellant waited until Masih quit moving before leaving the area, indicating she ensured he was dead, and she partially buried the body; (6) she consistently maintained the baby had been kidnapped and provided the truth only after hours of questioning; (7) after Masih's body was found, appellant asked about his condition, indicating to Detective Waters that appellant was concocting concern; and (8) appellant expressed no remorse during her interactions with the police and family members shortly after the offense and focused instead on her problems and what would happen to her.

In summary, because the evidence is sufficient to support the finding that appellant committed capital murder, we overrule her third issue.

13

## III. CONSTITUTIONALITY OF STATUTE

Next, we consider appellant's first and second issues, in which she argues the trial court erred by denying appellant's motion to declare unconstitutional the statute mandating appellant's life sentence without parole.

Texas Penal Code section 12.31(a)(2) provides, "An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole, if the individual committed the offense when 18 years of age or older." Tex. Penal Code Ann. § 12.31(a)(2). Appellant asserts that, as applied to her, section 12.31(a)(2) violates the constitutional prohibition against cruel-and-unusual punishment and the constitutional guarantee of equal protection,[4] by precluding, with respect to punishment, presentation of mitigating evidence regarding her mental illness.[5]

---

[4] Appellant challenges the statute under both the United States and Texas Constitutions. But, in each instance, the analysis under the Texas Constitution is the same as the analysis under the United States Constitution. *See Canady v. State*, 11 S.W.3d 205, 214–15 (Tex. Crim. App. 2000) (concluding that the analysis of an equal-protection challenge under the United States Constitution is the same as the analysis of an equal-rights challenge under article I, section 3 of the Texas Constitution); *Lewis v. State*, 448 S.W.3d 138, 147 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (concluding that, under binding precedent, the analysis of a cruel-and-unusual-punishment challenge under the United States Constitution is the same as the analysis of a cruel-or-unusual-punishment challenge under article I, section 13 of the Texas Constitution, notwithstanding the disjunctive language in the Texas Constitution and the conjunctive language in the United States Constitution).

[5] In her stated issue, appellant also asserts she is challenging Penal Code section 19.03(a)(8). However, section 19.03 is the statute that elevates certain murders to capital murders, *see* Tex. Penal Code Ann. § 19.03, whereas section 12.31(a)(2) is the statute that mandates a life sentence without parole for capital murder. *See id.* 12.31(a)(2). In her argument, appellant focuses solely on section 12.31(a)(2) because she complains about her mandatory punishment and that section 12.31(a)(2) precludes mitigating evidence relative to punishment. Nothing in section 19.03 precludes a defendant from presenting evidence regarding mental illness during the guilt-innocence phase relative to the culpable-mental-state element of the offense, as appellant was permitted to do. *See id.* § 19.03. Thus, we construe her challenge as concerning only section 12.31(a)(2).

Appellant raised these contentions in a written pre-trial motion. Then, at trial, appellant argued the contentions prior to her arraignment before the jury. The State responded that the contentions were premature before evidence was offered during trial regarding appellant's mental illness but also opposed the merits of the motion. The trial court orally denied the motion. After the defense rested, appellant re-urged the motion and recited, as an offer of proof, a summary of the evidence it would present regarding her mental illness, if permitted. The trial court again orally denied the motion.

As she represented in the trial court, appellant asserts on appeal that the statute is unconstitutional "as applied" to her. A defendant raising only an "as applied" challenge concedes the general constitutionality of the statute but asserts it is unconstitutional as applied to her particular facts and circumstances. *State ex rel. Lykos*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). Because a statute may be valid as applied to one set of facts and invalid as applied to a different set of facts, a defendant must show that, in its operation, the challenged statute was unconstitutionally applied to her. *Id.* A defendant challenging the constitutionality of a statute bears the burden to establish its unconstitutionality. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). Constitutionality of a criminal statute is a question of law, which we review *de novo*. *See Ex parte Nyabwa*, 366 S.W.3d 719, 723–24 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

## A.    Contention regarding cruel-and-unusual punishment

The Eighth Amendment to the United States Constitution prohibits cruel-and-unusual punishments. U.S. Const. amend. VIII. The Texas Constitution prohibits "cruel or unusual punishment." Tex. Const. art. I, § 13. Appellant contends that section 12.31(a)(2) imposes cruel and unusual punishment in her case by imposing a life sentence without parole on a mentally ill woman who kills

15

her own child and thereby precluding mitigating evidence of the mental illness to potentially lessen the sentence. Under binding precedent, we reject appellant's argument.

In *Harmelin v. Michigan*, the defendant argued that his sentence of life without parole for possession of cocaine violated the Eighth Amendment because, *inter alia*, the trial court was statutorily required to impose that sentence without considering mitigating evidence. 501 U.S. 957, 961–62, 994 (1991). In rejecting that argument, the United States Supreme Court reiterated its previous holdings that a death sentence is cruel and unusual under the Eighth Amendment if it is imposed without an individualized determination that the punishment is appropriate. *See id.* at 995 (citations omitted). However, the Court refused to extend this "individualized capital sentencing doctrine" to the context of a mandatory sentence of life in prison without parole. *Id.* at 995–96. The Court reasoned that no term of imprisonment—not even life without parole—could ever compare to the severity of capital punishment due to death being "unique in its total irrevocability." *See id.* (quoting *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring)).

Thus, under *Harmelin*, the Eighth Amendment does not afford a defendant who was an adult at the time of the offense the right to produce evidence of mitigating circumstances when the state seeks a life sentence without parole.[6] *See id.*; *see also Ex parte Chavez*, 213 S.W.3d 320, 324 n.20 (Tex. Crim. App. 2006); *Wilkerson v. State*, 347 S.W.3d 720, 722 (Tex. App.—Houston [14th Dist.] 2011,

---

[6] Subsequently, in *Miller v. Alabama*, the United States Supreme Court held that the Eighth Amendment forbids a mandatory sentence of life without parole for a **juvenile** offender, in part because of the lack of an individualized sentencing scheme. *See* — U.S. ——, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012); *see also Lewis v. State*, 428 S.W.3d 860, 863–64 (Tex. Crim. App. 2014). The *Miller* court emphasized that *Harmelin* applies only to defendants who were adults at the time of the offense. *See Miller*, — U.S. ——, 132 S.Ct. at 2470.

16

pet. ref'd). In *Wilkerson*, our court cited *Harmelin* when rejecting an argument that section 12.31(a)(2) violates the Eighth Amendment because it mandates a life sentence without parole for capital murder and thereby precludes consideration of mitigating evidence.[7] *See Wilkerson*, 347 S.W.3d at 722–23.

Moreover, the *Harmelin* court made no exceptions, including for a defendant who claims the mitigating evidence consists of the defendant's mental illness at the time of the offense. *See* 501 U.S. at 995–96. In this regard, appellant advances reasons why mental illness, particularly post-partum depression associated with Bipolar Disorder, should be a factor in assessing punishment when a woman commits infanticide. However, we need not consider those arguments in light of the precedent dictating that a statute mandating a life sentence without parole for an adult offender, irrespective of mitigating circumstances, does not violate the Eighth Amendment. *See id.*; *Wilkerson*, 347 S.W.3d at 722–23; *see also Coronado v. State*, 351 S.W.3d 315, 317 (Tex. Crim. App. 2011) (recognizing state court must apply dictates of United States Supreme Court on federal constitution matters).

Accordingly, the trial court did not err by denying appellant's request for a declaration that section 12.31(a)(2) imposes cruel and unusual punishment on appellant prohibited by the United States and Texas Constitutions. We overrule appellant's first issue.

---

[7] The *Wilkerson* court first concluded that the appellant in that case failed to preserve error in the trial court, and then concluded that, even if error preservation were not required, the challenge lacked merit under *Harmelin*. *See Wilkerson*, 347 S.W.3d at 722–23.

## B.     Equal-Protection Argument

The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Texas Constitution provides, "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Tex. Const. art. I, § 3. The Equal Protection Clause generally prohibits the government from using suspect classifications as a basis for discriminating between or among individuals. *Casarez v. State*, 913 S.W.2d 468, 473 (Tex. Crim. App. 1994). The principle of equal protection guarantees that "all persons similarly situated should be treated alike." *Walker v. State*, 222 S.W.3d 707, 710-11 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Unless a statute interferes with a "fundamental right" or discriminates against a "suspect class," the statute ordinarily will survive an equal-protection challenge if "the challenged classification is rationally related to a legitimate governmental purpose." *Henderson v. State*, 962 S.W.2d 544, 560 (Tex. Crim. App. 1997) (quoting *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458 (1988)). However, a threshold for asserting an equal-protection challenge is demonstrating that a classification discriminates among similarly situated individuals. *See Smith v. State*, 898 S.W.2d 838, 847 (Tex. Crim. App. 1995).

The crux of appellant's argument is that section 12.31(a)(2) "unfairly targets" an entire class—"women with mental illness exacerbated by postpartum depression"—by subjecting them to a mandatory sentence of life without parole and disallowing mitigating evidence. Appellant maintains the statute does not "give the same material respects to all defendants because [it does] not allow

mitigating evidence to be presented for all defendants." However, section 12.31(a)(2) does not allow mitigating evidence for any defendants that fall within its scope. *See* Tex. Penal Code Ann. § 12.31(a)(2). Therefore, there is no classification that treats any persons, including the class of women appellant defines, differently than similarly-situated persons: all adult offenders convicted of capital murder (in a case in which the State does not seek the death penalty) receive a mandatory sentence of life without parole. *See id.* Accordingly, in effect, appellant does not argue that members of her defined class are treated differently under the statute but instead that they **should** be treated differently. Consequently, appellant fails to establish an equal-protection violation. *See Smith*, 898 S.W.2d at 847 (rejecting capital-murder defendant's equal-protection challenge to statute prohibiting providing information regarding parole to jury in capital cases while permitting such information in non-capital cases because defendant was treated same as all other capital–murder defendants).

In a slightly different argument, appellant complains that mentally ill women convicted of capital murder may not offer mitigating evidence relative to punishment under section 12.31(a)(2) while mentally ill women convicted of murder may offer such evidence. *Compare* Tex. Penal Code Ann. § 12.31(a)(2) *with id.* § 12.32 (West 2011) (prescribing punishment for first degree felony and containing no mandatory life sentence). Again, appellant does not suggest that mentally ill women are treated differently than other defendants under either statute, but apparently challenges the different treatment of capital-murder defendants when compared to murder defendants. However, appellant fails to establish an equal-protection violation because capital-murder defendants and murder defendants are not similarly situated, and again appellant is treated the same as similarly situated individuals—capital-murder defendants. *See Smith*, 898

19

S.W.2d at 847; *see also Butler v. State*, 872 S.W.2d 227, 240 (Tex. Crim. App. 1994) (holding there was no equal-protection violation where capital-sentencing scheme permitted consideration of unadjudicated offenses but non-capital-sentencing scheme did not).

In summary, the trial court did not err by denying appellant's request for a declaration that section 12.31(a)(2) deprived her of equal protection under the United States and Texas Constitutions. We overrule appellant's second issue.

## IV. MOTION FOR NEW TRIAL

Finally, in her fourth issue, appellant argues the trial court erred by denying appellant's motion for new trial. We review the denial of a motion for new trial under the abuse-of-discretion standard. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012). A trial court abuses its discretion by denying a motion for new trial only when no reasonable view of the record could support the ruling. *Id.*

In the written motion, appellant requested a new trial so that she could present testimony from a jail chaplain showing appellant converted to Christianity and was a "wonderful" inmate while awaiting trial. At a hearing on the motion, the chaplain testified that if the law permitted mitigating evidence regarding punishment, she would testify about appellant's conversion and good character while incarcerated. The trial court orally denied the motion.

Appellant asserts the trial court abused its discretion because the proffered mitigating evidence would support a less severe punishment than life without parole. However, as discussed above, the life sentence without parole was mandatory, and we have rejected appellant's constitutional challenges to the statute mandating the sentence. Thus, any mitigating evidence would have been immaterial as it could not have altered the sentence. Accordingly, the trial court

20

did not abuse its discretion by denying the motion for new trial.  We overrule appellant's fourth issue.

Having overruled all of appellant's issues, we affirm the trial court's judgment.


/s/    John Donovan
Justice



Panel consists of Chief Justice Frost and Justices Christopher and Donovan.
Publish — Tex. R. App. P. 47.2(b).