

# Fourth Court of Appeals
## San Antonio, Texas

### DISSENTING OPINION

Nos. 04-19-00192-CR & 04-19-00193-CR

John Joe **AVALOS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2016-CR-10374, 2018-CR-7068
Honorable Lori I. Valenzuela, Judge Presiding

### DISSENTING OPINION ON EN BANC RECONSIDERATION

Opinion by:      Rebeca C. Martinez, Justice
Dissenting Opinion by: Luz Elena D. Chapa, Justice (joined by Sandee Bryan Marion, Chief
                 Justice and Patricia O. Alvarez, Justice)

Sitting en banc:  Sandee Bryan Marion, Chief Justice
                  Rebeca C. Martinez, Justice
                  Patricia O. Alvarez, Justice
                  Luz Elena D. Chapa, Justice
                  Irene Rios, Justice
                  Beth Watkins, Justice
                  Liza A. Rodriguez, Justice

Delivered and Filed: December 30, 2020

I respectfully dissent. For the reasons explained in the panel's original majority opinion,[1]

the current state of the law compels us as an intermediary court to conclude that when an

---

[1] I have attached the opinion as an appendix to this dissent. *See, e.g.*, *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 703 (Tex. 2007) (O'Neil, J., dissenting) (attaching original opinion to new dissenting opinion).

intellectually disabled adult commits capital murder, imposing an automatic life sentence without parole—without an individualized sentencing determination as is required for juveniles under *Miller v. Alabama*—is not unconstitutionally cruel and unusual. *See* 567 U.S. 460 (2012); TEX. PENAL CODE § 12.31(a)(2). I write separately to: (1) briefly respond to the en banc majority opinion; (2) note the broad implications of the majority's holding; and (3) recommend that the Texas Legislature amend Penal Code section 12.31(a)(2) to account for intellectually disabled offenders' diminished culpability.

## RESPONSE TO THE EN BANC MAJORITY

The panel majority identified five differences between juvenile and intellectually disabled adult offenders. The en banc majority notes "differences exist," but does not identify those differences or explain why most of these differences are immaterial. In a footnote, the majority addresses the difference in actual time served by a juvenile with a life sentence and by an intellectually disabled adult with the same sentence. *See Miller*, 567 U.S. at 470. But the majority does not address the most salient difference between the two classes of offenders. Juveniles are generally expected to develop intellectually, *id.* at 472–73, but "[i]ntellectual disability is a permanent condition." *Bourgeois v. Watson*, 977 F.3d 620, 637 (7th Cir. 2020) (citing *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)). If juveniles are entitled to individualized sentencing because the developmental features of youth are transient, and a juvenile's likelihood of future intellectual development should be considered at a punishment hearing, then it is unclear how the majority's holding flows straightforwardly from *Miller* when impaired cognitive functioning is an "intellectual disability" only if the condition is permanent. *See* 567 U.S. at 470.

## THE BROAD IMPLICATIONS OF THE MAJORITY'S HOLDING

Although the majority refers to the "combined reasoning" of *Miller v. Alabama* and *Atkins v. Virginia*, the majority extends *Miller* to adult offenders, and extends *Atkins* to non-death penalty

cases. Because both Supreme Court decisions are retroactive in habeas proceedings, the majority's holding could require unearthing numerous capital murder cases for new punishment hearings. *See Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016) (holding *Miller* is retroactive); *Ex parte Maxwell*, 424 S.W.3d 66, 72 n.25 (Tex. Crim. App. 2014) (stating *Atkins* is retroactive).[2] The implications for the families of capital murder victims—families who once had some closure through prior legal proceedings—are considerable. The majority's holding could also extend to automatic life sentences without parole for repeat violent sexual offenders who are intellectually disabled. *See* TEX. PENAL CODE § 12.42(c)(4). And, "when the issue [of the defendant's intellectual disability] is presented at trial," and a jury is considering the death penalty, the majority's holding could have implications for jury instructions and other procedures in death penalty cases, over which the Court of Criminal Appeals has exclusive jurisdiction. *Gallo v. State*, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007).

Additionally, by declaring a sentencing statute unconstitutional as applied to a class of offenders, the majority creates a conflict with our sister court, which rejected this very same challenge with detailed reasoning. *Parsons v. State*, No. 12-16-00330-CR, 2018 WL 3627527, at *4–5 (Tex. App.—Tyler July 31, 2018, pet. ref'd) (mem. op., not designated for publication). Consequently, the sentencing of intellectually disabled capital offenders will differ depending upon where in Texas the offense occurred. And throughout the country, "courts faced with *Atkins*-based challenges by intellectually-disabled offenders have found *Atkins* only applies to those offenders with death penalty sentences." *State v. Tuecke*, No. 15-0617, 2016 WL 1681524, at *8

---

[2] *See, e.g.*, *Ex parte Gutierrez*, WR-70,152-03, 2020 WL 6930823, at *1 (Tex. Crim. App. Nov. 25, 2020) (per curiam) (not designated for publication) (reforming a death penalty sentence for an intellectually disabled offender to an automatic life sentence); *Ex parte Lizcano*, WR-68,348-03, 2020 WL 5540165, at *1 (Tex. Crim. App. Sept. 16, 2020) (per curiam) (not designated for publication) (same); *Ex parte Henderson*, WR-37,658-03, 2020 WL 1870477, at *1 (Tex. Crim. App. Apr. 15, 2020) (per curiam) (not designated for publication) (same).

(Iowa Ct. App. Apr. 27, 2016). The majority's holding therefore brings Texas out of step with the growing consensus of other jurisdictions, including Iowa, Illinois, Pennsylvania, Oregon, and the 7th and 11th Circuits.[3]

### THIS LEGISLATURE SHOULD CONSIDER REVISING SECTION 12.31(a)(2)

This issue is challenging because we must set aside our personal beliefs about the fairness of Texas's sentencing practices. From a public policy perspective, Texas's sentencing laws could and should be fairer in considering intellectually disabled offenders' diminished culpability. But expressing the will of the people of Texas, duly elected members of our legislature balanced various public policy considerations and came to a different conclusion through a democratic process. TEX. PENAL CODE § 12.31(a)(2). While "[i]t is emphatically the province and duty of the judicial department" to strike down laws that violate constitutional rights, *Marbury v. Madison*, 5 U.S. 137, 177-78 (1803), our position as an intermediate state court of appeals requires faithful adherence to the Supreme Court's constitutional jurisprudence, just as statutory construction requires faithful adherence to a statute's plain language. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

A growing national consensus of courts—indeed, in a diverse set of jurisdictions—has concluded the Eighth Amendment does not require the consideration of intellectual disability for non-death penalty cases involving adults. *See supra* note 3. Notably, the sole case from another jurisdiction relied upon by Avalos on original submission—*People v. Coty*—was reversed by the Supreme Court of Illinois the day after the panel issued its opinion and judgment in these appeals.

---

[3] *See id.* (citing *United States v. Gibbs*, 237 F. App'x 550, 568 (11th Cir. 2007) (finding *Atkins* was inapplicable in the context of a sentence that did not involve the death penalty); *Harris v. McAdory*, 334 F.3d 665, 668 n.1 (7th Cir. 2003) (same); *People v. Brown*, 967 N .E.2d 1004, 1022 (Ill. App. Ct. 2012) (same); *Commonwealth v. Yasipour*, 957 A.2d 734, 744 (Pa. Super. Ct. 2008) (same)); *see State v. Ward*, 437 P.3d 298, 312 (Or. Ct. App. 2019) (rejecting argument that *Miller* applies to intellectually disabled adults), *rev'd on other grounds*, 475 P.3d 420 (2020).

*People v. Coty*, 2020 WL 2963311, at \*11 (Il. June 4, 2020) (reversing court of appeals and holding an automatic life sentence without parole was not unconstitutional as applied to intellectually disabled sex offender). Today, the majority deviates from the growing national consensus of courts considering this issue. The majority's reasoning shows how one day, the Supreme Court might conclude an automatic life sentence without parole for intellectually disabled offenders is unconstitutionally cruel and unusual. But given the growing consensus of other courts throughout the country, it simply does not appear that day has come.

When a "decision [does not] flow[] straightforwardly from [the Supreme Court's] precedents," judicial declarations that legislatively enacted sentencing statutes are unconstitutional have broad implications. *Miller*, 567 U.S. at 483. Under *Parsons*—and the overwhelming weight of authority from other jurisdictions—the prerogative to change constitutional, legislatively enacted statutes belongs to the legislature. 2018 WL 3627527, at \*4–5. The Texas Legislature should therefore consider revising Penal Code section 12.31(a) to account for the diminished culpability of intellectually disabled capital offenders as a matter of public policy. Such a legislative change would provide fairness and justice for intellectually disabled offenders in future cases without the retroactive ramifications of premature constitutional declarations by the judiciary. Such legislation would also be a step in the right direction for evolving standards of decency that might, one day, be constitutionally relevant for intellectually disabled offenders. *See Graham v. Florida*, 560 U.S. 48, 61 (2010).[4]

---

[4] In a footnote, the majority states it need not consider objective indicia of evolving standards of human decency because *Miller* and *Atkins* compel its holding. However, such objective indicia can be a relevant factor to consider. *See, e.g.*, *Miller*, 567 U.S. at 482–83.

## CONCLUSION

Because the significant differences between juvenile and intellectually disabled adult offenders reasonably explain why individualized sentencing is constitutionally mandatory for the former, but the not the latter, I respectfully dissent.

Luz Elena D. Chapa, Justice

# **Appendix**
## Original Panel Majority Opinion



## Fourth Court of Appeals
### San Antonio, Texas

## OPINION

Nos. 04-19-00192-CR & 04-19-00193-CR

John Joe **AVALOS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2016-CR-10374, 2018-CR-7068
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:       Rebeca C. Martinez, Justice
           Patricia O. Alvarez, Justice
           Luz Elena D. Chapa, Justice

Delivered and Filed: June 3, 2020

AFFIRMED

In these two appeals, we are presented with a single issue of first impression: When an intellectually disabled person is convicted of capital murder, and the State does not seek the death penalty, is an automatic life sentence without parole unconstitutionally cruel and unusual? Based on the record and arguments before us, we cannot say the imposition of such a punishment is unconstitutional as applied to all intellectually disabled persons in every case. We therefore affirm the trial court's judgments.

**PROCEDURAL BACKGROUND**

Under a plea agreement, Johnny Joe Avalos, an adult, pled guilty to two charges of capital murder. The State did not seek the death penalty. In the plea agreements, Avalos and the State mutually agreed and recommended that punishment be assessed at "capital life." "Capital life" is a reference to Texas Penal Code section 12.31(a)(2)'s requirement of an automatic life sentence without parole for a person convicted of capital murder, when the death penalty is not imposed. *See* TEX. PENAL CODE § 12.31(a)(2).

Avalos filed motions challenging the constitutionality of his automatic life sentences without parole. He argued the Supreme Court of the United States' decisions under the Eighth Amendment prohibit the imposition of such a sentence on intellectually disabled persons. The trial court denied Avalos's motions, accepted his guilty pleas, found him guilty of both capital murder offenses, and pronounced his life sentences in open court. Avalos timely perfected appeal.[1]

**THE CONSTITUTIONALITY OF SECTION 12.31(a)(2)**
**AS APPLIED TO INTELLECTUALLY DISABLED PERSONS**

Avalos's sole issue is whether section 12.31(a)(2)'s requirement of an automatic life sentence without parole for capital murder, when the death penalty is not imposed, is unconstitutionally cruel and unusual as applied to intellectually disabled persons. Avalos argues the decisions of the Supreme Court of the United States under the Eighth Amendment compel the conclusion that section 12.31(a)(2) is unconstitutional as applied to intellectually disabled persons.

**A. Cruel & Unusual Punishments**

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishments. U.S. CONST. amend. VIII. Article I, section 13, of the Texas Constitution also prohibits

---

[1] After oral argument, we granted the parties' joint motion to abate these appeals for the trial court to make an express finding as to whether Avalos is intellectually disabled. The trial court made findings in both cases that Avalos is intellectually disabled.

punishments that are cruel and unusual. TEX. CONST. art. I, § 13. There is "no significance in the difference between the Eighth Amendment's 'cruel and unusual' phrasing and the 'cruel *or* unusual' phrasing of Art. I, Sec. 13 of the Texas Constitution." *Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997).

The "cruel and unusual" standard is based on "a precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002) (internal quotation marks omitted). Proportionality is informed by objective evidence of contemporary values. *Id.* at 312. "[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Id.* A court must also "consider reason[s] for agreeing or disagreeing with their judgment" in light of "evolving standards of decency." *Id.* at 313, 321.

The Supreme Court of the United States, the Texas Court of Criminal Appeals, and this court have not yet addressed whether an automatic life sentence without parole, imposed upon an intellectually disabled person, is unconstitutionally cruel and usual. Avalos argues such a conclusion logically follows from the Supreme Court's Eighth Amendment decisions. Because there is no significant difference between the Texas Constitution and U.S. Constitution on this issue, we address Avalos's issue in light of the Supreme Court's decisions. *See Cantu*, 939 S.W.2d at 645. We also consider the decisions of other courts applying these Eighth Amendment decisions for their persuasive value.

**B. Relevant Supreme Court Decisions**

In *Atkins v. Virginia*, the Supreme Court held the imposition of the death penalty on an intellectually disabled person is unconstitutionally cruel and unusual. 536 U.S. at 321. The Supreme Court first considered the acts of several state legislatures to exclude intellectually disabled persons from eligibility for the death penalty. *Id.* at 313–17. The Supreme Court also held

that sentencing intellectually disabled persons to death did not substantially further two bases for imposing the death penalty: retribution and deterrence. *Id.* at 318–19. With respect to retribution, the Supreme Court explained that because "only the most deserving of execution are put to death, an exclusion for the [intellectually disabled] is appropriate." *Id.* at 319. With respect to deterrence, the Supreme Court explained the availability of the death penalty for intellectually disabled persons, who often act impulsively, would likely not deter them from "murderous conduct," and excluding intellectually disabled persons from eligibility for the death penalty would not undermine the deterrent effect the death penalty has on others. *Id.* at 319–20. The Supreme Court also considered that intellectually disabled persons generally "face a special risk of wrongful execution" due to an increased risk of false confessions, they generally have lesser abilities to communicate with counsel and to make a persuasive showing of mitigation to the jury, and "their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320–21. The Supreme Court therefore held the death penalty is cruel and unusual when imposed on an intellectually disabled person. *Id.* at 321.

Although the Supreme Court has not considered the imposition of an automatic life sentence without parole as applied to intellectually disabled persons, Avalos argues the Supreme Court's decisions regarding juveniles guides our resolution of these appeals. In *Roper v. Simmons*, the Supreme Court held the death penalty is unconstitutionally cruel and unusual when imposed on a juvenile. 543 U.S. 551, 578 (2005). As in *Atkins*, the Supreme Court began by considering "[t]he evidence of national consensus against the death penalty for juveniles." *Id.* at 564. "Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569. The Supreme Court noted juveniles: (1) lack maturity and have an underdeveloped sense of responsibility; (2) "are more vulnerable or susceptible to negative influences and outside pressures, including peer

pressure"; and (3) have a relatively unformed character. *See id.* at 569–70. The Supreme Court explained "the penological justifications for the death penalty apply to [juveniles] with lesser force than to adults." *Id.* at 571. Quoting *Atkins*, the Supreme Court concluded, "The same conclusions follow from the lesser culpability of the juvenile offender." *Id.*

In *Graham v. Florida*, the Supreme Court extended Eighth Amendment protections for juveniles in the context of automatic life sentences without parole for nonhomicide offenses. 560 U.S. 48, 74 (2010). In *Graham*, the Supreme Court relied on *Roper* to explain the diminished culpability of juveniles in light of the penological interests served by a life sentence without parole. *See id.* at 67–69, 71–75. The Supreme Court stated that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences." *Id.* at 69. The Supreme Court explained a life sentence without parole denies all hope of release and "means . . . good behavior and character improvement are immaterial." *Id.* at 71. The Supreme Court also explained such a punishment is "especially harsh" for juveniles who "will on average serve more years and a greater percentage of . . . life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." *Id.* at 70.

In *Miller v. Alabama*, the Supreme Court extended *Graham* to include life sentences without parole for homicide offenses, "hold[ing] that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" 567 U.S. 460, 465 (2012). The Supreme Court noted, "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing" and explained that "[d]eciding that a juvenile offender forever will be a danger to society would require mak[ing] a judgment that [he] is incorrigible—but incorrigibility is inconsistent with youth." *Id.* at 471–73 (internal quotation marks omitted). The Supreme Court concluded juveniles are entitled to an individualized sentencing determination in which "a judge

or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489. Avalos argues intellectually disabled persons are entitled to the same type of individualized sentencing determination.

The State argues we are bound by the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991). In *Harmelin*, the majority of the Supreme Court concluded the imposition of an automatic life sentence without parole for the offense of possession of 650 grams of cocaine was not cruel and unusual. *Id.* at 961, 996. The *Harmelin* plurality did not consider a proportionality review and considered the originally intended meaning of "cruel and unusual" in the Eighth Amendment. *See id.* at 994–95. The plurality's approach differed from the approach taken in Justice Kennedy's concurrence, in which he reached the same conclusion as the plurality, except by emphasizing the proportionality of the sentence as opposed to the Framers' original intent. *Id.* at 996–1001 (Kennedy, J., concurring).

## C. Other Relevant Authorities

The parties also rely on decisions from other courts. Avalos principally relies on *People v. Coty*, 110 N.E.3d 1105 (Ill. App. Ct. 2018). In *Coty*, a jury convicted an intellectually disabled defendant as a repeat offender for sexual assault of a minor. *Id.* at 1107–08. An automatic life sentence without parole was assessed and, on appeal, the court of appeals reversed the sentence. *Id.* at 1108. The court held an automatic life sentence without parole was not facially unconstitutional under the Eighth Amendment, but was unconstitutional under Illinois's state constitution as applied to the defendant due to his intellectual disability. *See id.* On remand, the defendant was resentenced to 50 years in prison. *See id.* In the defendant's second appeal, the court of appeals noted the evolution in standards of decency required that the trial court consider evidence of the defendant's intellectual disability in sentencing. *Id.* at 1121–22. The court of appeals in *Coty* saw no reason why "the prohibition against the imposition of discretionary *de facto*

life sentences without the procedural safeguards of *Miller* and its progeny should not be extended to intellectually disabled persons." *Id.* at 1122.

The State relies on *Parsons v. State*, in which the Tyler court of appeals considered and rejected the very same position Avalos takes in these appeals. *See* No. 12-16-00330-CR, 2018 WL 3627527, at \*4–5 (Tex. App.—Tyler July 31, 2018, pet. ref'd) (mem. op., not designated for publication). The Tyler court reasoned that although there are some similarities between juveniles and intellectually disabled persons, the differences are too significant to extend the Supreme Court's precedents regarding juveniles, specifically *Miller*'s categorical bar to an automatic life sentence without parole, to intellectually disabled persons. *Id.* The State also relies on *Modarresi v. State*, in which the Houston court of appeals relied on *Harmelin* to reject a contention that section 12.31(a)(2) was unconstitutional as applied to someone suffering from "mental illness, particularly post-partum depression associated with Bipolar Disorder." 488 S.W.3d 455, 466 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The court in *Modarresi* noted the Supreme Court in *Harmelin* held an automatic life sentence without parole is constitutional without exception. *See id.*

### D. Analysis

Not a single Supreme Court decision directly controls the resolution of these appeals. Although the court of appeals in *Modarresi* treated *Harmelin* as controlling in all contexts, there is no indication that the appellant in *Harmelin* was intellectually disabled. In other words, *Harmelin* is not controlling because it "had nothing to do with [intellectually disabled persons]." *Cf. Miller*, 567 U.S. at 481 (declining to extend *Harmelin* to juveniles because "*Harmelin* had nothing to do with children"). Furthermore, the Supreme Court in *Harmelin* was able to reach a majority in its ultimate holding, but the plurality and concurrence disagreed as to the appropriate legal principles and modes of constitutional interpretation, and the Supreme Court later rejected the plurality's approach in subsequent cases, including *Atkins*. As one example, the *Harmelin*

plurality rejected proportionality as a consideration and construed the Eighth Amendment's phrase "cruel and unusual" considering the original intent of the language as used in the 1700s. *See* 501 U.S. at 965 ("[T]he Eighth Amendment contains no proportionality guarantee."). In *Atkins*, the Supreme Court considered proportionality and construed the phrase "cruel and unusual" in "evolving standards of decency" and "contemporary values." *See* 536 U.S. at 311–12.

Conversely, not a single Supreme Court decision has held an automatic life sentence without parole is unconstitutionally cruel and unusual when imposed on an intellectually disabled person. Avalos's position therefore turns on the strength of the analogy between intellectually disabled persons and juveniles under the Eighth Amendment. As to this analogy, the Tyler court's analysis in *Parsons* is persuasive:

> Although some of the reasoning behind the Court's decision in *Miller* might apply to intellectually disabled defendants as well as it does to juveniles, significant portions of the reasoning do not. These reasons include that (1) juvenile offenders have greater prospects for reform than adult offenders, (2) the character of juvenile offenders is less well formed and their traits less fixed than those of adult offenders, (3) recklessness, impulsivity, and risk taking are more likely to be transient in juveniles than in adults, (4) a sentence of life without parole is harsher for juveniles than adults because of their age, and (5) a sentence of life without parole for juveniles is akin to a death sentence because of their age. We know of no reason to believe that these factors apply to intellectually disabled offenders.

2018 WL 3627527, at *5. This analysis accounts for the Supreme Court's specific considerations in *Miller* and *Graham*, such as the difference in time actually served by a 16-year-old and a 75-year-old for identical "life" sentences, and the inconsistency of incorrigibility with youth. *See Graham*, 560 U.S. at 70; *Miller*, 567 U.S. at 472–73. Avalos's reasoning and the Illinois case he cites, *Coty*, do not adequately account for the significant differences between juvenile offenders and adults identified by the Supreme Court in *Miller* and *Graham*.

We also note an additional point of distinction. In *Graham* and *Miller*, as well as *Atkins* and other Eighth Amendment cases, the Supreme Court considered the laws enacted by states'

legislatures. Avalos did not provide the trial court, and has not provided us, with any citations, discussion, or analysis of objective evidence of evolving standards of decency, such as the sentencing laws or practices of other states. *See* TEX. R. APP. P. 38.1(i); *Atkins*, 536 U.S. at 311–12 (considering such objective evidence of evolving standards of decency). We disagree with Avalos's specific contention on appeal, namely that the Supreme Court's decisions compel the conclusion that an automatic life sentence without parole is unconstitutional as applied to intellectually disabled persons. Without the objective evidence necessary to resolve Avalos's Eighth Amendment issue, we cannot say, in the first instance, that such a punishment is unconstitutionally cruel and unusual under either the U.S. Constitution or the Texas Constitution.

## CONCLUSION

We hold the Supreme Court's decisions in *Atkins*, *Roper*, *Graham*, and *Miller* do not compel the conclusion that Texas Penal Code section 12.31(a)(2) is unconstitutional as applied to intellectually disabled persons. Having been provided no objective evidence of evolving standards of decency required to analyze whether the punishment here is unconstitutional, we cannot say Avalos's sentences are unconstitutionally cruel and unusual punishments. We therefore overrule Avalos's sole issue in these appeals and affirm the appealed judgments.

Luz Elena D. Chapa, Justice

PUBLISH