# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00528-CR

---

**Meechaiel Khalil Criner, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 167TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-18-904027, THE HONORABLE P. DAVID WAHLBERG, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Meechaiel Khalil Criner was charged with capital murder. *See* Tex. Penal Code §§ 19.02(b)(1), .03. During the trial, Criner sought to suppress evidence pertaining to items seized during the investigation by the police, but the district court denied the motion to suppress. The jury found Criner guilty of the charged offense, and the district court imposed a mandatory sentence of life in prison and rendered its judgment of conviction. *See id.* § 12.31. Following his conviction, Criner filed a motion for new trial alleging that he discovered new evidence after the trial. After convening a hearing, the district court denied the motion for new trial. In four issues on appeal, Criner contends that the district court erred by denying his motion to suppress, that mandatory life sentences are unconstitutional, that the district court's judgment of conviction contains an error that needs correcting, and that the district court erred by denying his motion for new trial. We will modify the district court's judgment of conviction and affirm the judgment as modified.

BACKGROUND

Criner was charged with the capital murder of H.W. for allegedly strangling her with a ligature while he was in the course of committing or attempting to commit aggravated sexual assault, kidnapping, or robbery. The following summary comes from the testimony and other evidence presented at the trial.

The offense allegedly occurred at night on April 3, 2016, on the campus of the University of Texas at Austin. H.W. was a student at the University. On the night in question, H.W. called her on-campus roommate at around 9:30 p.m. to tell her roommate that she was walking back to the dorm from the University's dance production lab. At that time, H.W. was wearing a black turtleneck, black pants or leggings, and black Doc Marten boots, and she was carrying a blue duffle bag that had red handles. The bag contained, among other items, a sweater, a book entitled "All the Light We Cannot See," and a silver Apple laptop. On prior occasions when H.W. walked home from the lab, she took a path along Waller Creek that ran behind the Alumni Center for the University. On her way to the dorm, H.W. was texting with a friend but stopped responding to the texts from her friend around 9:40 p.m. H.W. did not return to her dorm room that night. The following morning, H.W.'s roommate and friends reported her missing to the University's Police Department.

During their investigation, the police reviewed security footage of a loading dock from a building near Waller Creek. The footage from April 3 showed an African American man riding a bicycle down the loading dock at 9:20 p.m. The man was wearing an orange bandana around his neck, glasses, a backpack, and a dark jacket with patches on the shoulders. The bike was later described as a red bike with a woman's frame that had tape on the handlebars. The man left the area at 9:21 p.m. without his bike, returned at 9:32, left at 9:33 on his bike, and then

2

returned again at 9:38. Around that same time, another person who was wearing dark clothing walked to the area and headed for a path behind the Alumni Center. The other person was looking at the screen of an electronic device. After noticing the other person, the man got off his bike, followed the path of the other person, reached underneath his backpack, and pulled out an object. The man disappeared from view at 9:39 p.m.

After reviewing the footage summarized above, police officers searched the Waller Creek area and found H.W.'s naked body in the creek. She had been placed between two rocks and covered with branches. There was a strap around her neck, and she had sustained injuries to her head. An autopsy revealed that the cause of death was strangulation and blunt force trauma to the head and that H.W. had bruising on her vaginal wall that was consistent with sexual assault.

In addition to finding H.W.'s body, the police found at the scene a claw hammer with one claw broken off and a pair of prescription glasses. At trial, an optician and an optometrist testified regarding the glasses. The optician testified that Criner had purchased glasses from her store, that her store sold the style of frames for the glasses found in the creek, and that the pair of glasses that she sold to Criner had the same prescription and lens size as the glasses from the creek. In her testimony, the optician stated that she could not say for certain that glasses recovered from the creek were Criner's and that there was a 1.2 centimeter difference in "the pupillary distance" between the recovered glasses and Criner's prescription, but she also explained that it was normal for glasses to differ from the original prescription due to events that occur in production. The optometrist who wrote the prescription for Criner testified that the pupillary distance for the recovered glasses was consistent with that of a child and that a difference of 1.2 centimeters would be noticeable and could lead to double vision and dizziness,

3

but he also explained that inaccuracies in pupillary distance can be caused by imprecise measurements, errors that occur in the production of the glasses, or bending in the frame. Moreover, the optometrist testified that the prescription for the recovered glasses was consistent under accepted standards of variation with the prescription that he wrote for Criner and that Criner had a "rare" prescription.

After H.W.'s body was found, two employees for the University were tasked with reviewing additional surveillance footage from other security cameras on the campus to look for evidence regarding the offense. The man seen on the loading dock security footage was not seen on surveillance footage again until 11:24 p.m. when he was seen at the north end of the University's football stadium. At that time, the man was carrying a blue bag that he did not have earlier, was no longer wearing glasses, and had retrieved his bike.

As will be detailed further below, the police eventually identified Criner as a suspect, and extensive evidence was presented at trial regarding his location before and after the offense in question. Late in March, Criner left his foster home in Killeen, Texas, and headed to Austin, Texas. Before leaving, Criner had been given eyeglasses. Shortly after he arrived in Austin, Criner began hanging around the University and neighboring areas. On March 30, a member of an athletic team for the University found some property inside what should have been the team's empty storage room in the football stadium, and the individual took photos of the items in the storage room, including ropes, straps, a claw hammer with one claw missing, and a lime green shirt. After the individual informed the University that there might be someone living in the storage room, a representative for the University went to the storage room, found Criner, and told him to gather his property and leave. When the representative returned later, Criner and all his belongings were gone.

4

On the day after the offense in question, firefighters received a call regarding a possible fire at a vacant building that was being remodeled in the Medical Arts Square near the University. When the firefighters arrived, they found Criner inside the building and also discovered that he had started a small fire inside. After learning that Criner was a minor and was homeless, the firefighters and the responding police officers made arrangements to have Criner stay at LifeWorks, which is a shelter for minors. Although the police officers and firefighters explained that Criner could take some of the items that he had in the building, they also told him that he could not take all of the property to the shelter.

Criner placed several of the items in two of his bags to take with him to the shelter. One of the bags was a backpack, and the other was a blue duffle bag with red straps. The firefighters and the police officers gathered up the remainder of the items, placed them inside a gray trash can, and set the trash can at the bottom of a cement staircase on the outside of the building that led to a door to the basement of the building. One of the firefighters also informed Criner that he would take one of the three bicycles inside the building to the firehouse for safekeeping and asked Criner to select which bike he wanted the firefighters to take. Criner chose a red bike with a woman's frame that had tape on the handlebars. After the police officers and firefighters secured Criner's belongings, one of the police officers drove Criner to LifeWorks.

As part of their investigation, the police released some surveillance footage of the loading dock at the University to the media. When the footage was shown on a local news station, one of the firefighters who responded to the call at the Medical Arts building and who interacted with Criner recognized Criner and the bicycle from the footage. After the firefighter informed his supervisor, his supervisor contacted the police, and police officers subsequently went to the Medical Arts building and to the LifeWorks shelter.

5

While at the Medical Arts building, police officers recovered several items from inside the building and from inside the gray trash can that firefighters and police officers used to store some of Criner's property. Inside the firepit, the police found a piece of rubber appearing to be part of a boot that had been burned. In addition, the police found inside the building straps and ropes, including one strap that was described as an "exact match" to the strap that was used to kill H.W.

Inside the trash can, the police found straps, a portion of a Doc Marten boot that had been burned, and a black turtleneck and black pants that were sandy and resembled the clothes H.W. was last seen wearing. One of the straps appeared to be the same type of strap that had been used to strangle H.W. The police also found a sweater that had a receipt in the pocket with H.W.'s name on it. Further, the police recovered the following items that appeared to match the clothes that the suspect was wearing in the surveillance footage: an orange bandana and a black jacket with shoulder patches. The jacket was characterized as an "exact match" to the jacket seen on the surveillance footage. The police also found a lime green shirt. While the items were being inventoried, a hair was discovered on the lime shirt, and subsequent mitochondrial DNA testing performed on the hair excluded more than 99% of the population of North America, including Criner, as potential sources of the hair but could not exclude H.W. and her maternal relatives. During the trial, Criner made an oral motion to suppress the items recovered from the trash can, but the district court denied that motion.

At the LifeWorks shelter, the police searched Criner's room and found, among other items, a silver Apple laptop, a blue duffle bag with red straps, a nylon strap that was similar to the one found wrapped around H.W.'s neck, a backpack, and a copy of "All the Light We Cannot See." After Criner was arrested, the remainder of his possessions was placed in the

6

custody of the Department of Family and Protective Services. The police seized some of those items later, including a gray calculator with H.W.'s name on it, a pencil bag with her name on it, Criner's Nextbook laptop, and several flash drives belonging to Criner.

During the trial, Manuel Fuentes testified that he performed a forensic extraction on Criner's Nextbook laptop and the flash drives. Fuentes explained that during the extraction, pictures of Criner from March 24, 2016, and March 27, 2016, were recovered showing him wearing glasses, an orange bandana, and a "yellowish" shirt, and those photos were admitted as exhibits. In his testimony, Fuentes also described various forensic reports that he ran on Criner's laptop and related that the reports showed the following computer activity on the night of the offense: using the Internet around 8:12 p.m., being turned on or rebooted at 8:26 p.m., "powering up" at 8:44 p.m., registering a USB device at 9:17 p.m., running various programs at 9:18 p.m. and 9:33 p.m., being "active" between 8:40 p.m. and 9:33 p.m., and displaying a text document at 11:54 p.m. Fuentes also testified that if the computer was bouncing around in a backpack, the computer might report some of the activity listed above.

Once the State rested and closed, Criner elected to testify. In his testimony, Criner explained that after he ran away from his foster home in Killeen, he stayed in a hospital parking garage in Austin for a few days before discovering the storage room at the University. Further, Criner related that he stayed in the storage room for several days, left two of his bags as well as his glasses in the storage room when he was asked to leave, and then moved into the Medical Arts building. Regarding the night in question, Criner testified that he went back to the hospital parking garage to charge his computer and cell phone, that he returned to the Medical Arts building before nightfall, that he did not leave the building that night, that he used his computer that night, and that he had to reboot the computer because it was malfunctioning.

7

Regarding the morning after the offense occurred, Criner testified that he went through the contents of several dumpsters and found a red bike and multiple bags containing various items, including ropes, clothes, and a laptop. Additionally, Criner denied killing H.W. or ever seeing her, stated that he did not have a red bike on the day of the offense, discussed losing his hammer before he was kicked out of the storage room at the University, and explained that the glasses that the police found at the scene of the crime were not his.

After considering the evidence presented at trial, the jury found Criner guilty of capital murder, and the district court imposed a mandatory life sentence with the possibility of parole. Following his conviction, Criner filed a motion for new trial asserting that he discovered new evidence pertaining to his Nextbook laptop after the trial concluded. After convening a hearing on the motion for new trial, the district court denied the motion.

Criner now appeals his conviction.

## DISCUSSION

In four issues on appeal, Criner argues that the district court erred by denying his motion to suppress, that his mandatorily imposed sentence is unconstitutional, that the district court's judgment contains an error requiring correction, and that the district court erred by denying his motion for new trial. We will address those claims in the order briefed.

### Motion to Suppress

In his first issue on appeal, Criner asserts that the district court erred when it denied his oral motion to suppress the items found in the trash can outside the Medical Arts

building.[1]  *See* U.S. Const. amend. IV (prohibiting "unreasonable searches and seizures"); Tex. Code Crim. Proc. art. 38.23 (providing that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case").

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013).  Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).  Appellate courts apply "a bifurcated standard, giving almost total deference to the historical facts found by the trial court and analyzing *de novo* the trial court's application of the law." *See State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015); *see also Arguellez*, 409 S.W.3d at 662 (explaining that appellate courts afford "almost complete deference . . . to [a trial court's] determination of historical facts, especially if those are based on an assessment of credibility and demeanor"). "The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor." *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010).  "When a trial judge makes express findings of fact, an appellate court must

---

[1] Criner also sought to suppress evidence pertaining to items found inside the building. The district court denied that portion of Criner's motion to suppress as well, and Criner explains in his appellant's brief that he is not challenging this ruling by the district court and instead states that he "is contesting only the search of the trash[]can which was located outside of the vacant building."

examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record." *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017). "The appellate court then proceeds to a de novo determination of the legal significance of the facts as found by the trial court—including the determination of whether a specific search or seizure was reasonable." *Id.*

"Whether a defendant has standing to contest a search and seizure is a question of law" that appellate courts "review *de novo*." *Parker v. State*, 182 S.W.3d 923, 925 (Tex. Crim. App. 2006). "To challenge a search, the defendant must have a legally protected right to the expectation of privacy." *Id.* In other words, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). The defendant "bears the burden of demonstrating a legitimate expectation of privacy." *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002); *see also State v. Elrod*, 395 S.W.3d 869, 877 (Tex. App.—Austin 2013, no pet.) (explaining that "[a] defendant seeking to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment . . . must show that he personally had a reasonable expectation of privacy that the government violated"). To establish "standing to challenge the legality of" a search, the defendant must show "that he had a subjective expectation of privacy in the place invaded that society is prepared to recognize as reasonable." *Elrod*, 395 S.W.3d at 877.

When deciding if an appellant has demonstrated an expectation of privacy that is objectively reasonable, reviewing courts examine the totality of the circumstances that surrounded the search, including consideration of the following: whether the defendant's "claim of privacy is consistent with historical notions of privacy" and whether he "had a property or possessory interest in the place invaded," "was legitimately in the place invaded," "had complete

10

dominion or control and the right to exclude others," "took normal precautions customarily taken by those seeking privacy" before the intrusion, and "put the place to some private use." *Id.* Those factors are "not exhaustive, . . . and none is dispositve of a particular assertion of privacy." *Granados*, 85 S.W.3d at 223.

Before the district court made its ruling, the State called several firefighters and police officers to the stand who went to the Medical Arts building either in response to the 911 call about a potential fire or later as part of the investigation into the death of H.W. One of the firefighters who responded to the 911 call testified that the Medical Arts building was under construction and had been "demoed inside," that Criner was the only occupant when the firefighter arrived, and that Criner related that he was a minor and homeless. Another firefighter who responded to the call testified that there was a couch, a table, and other items in the otherwise vacant building. In his testimony, the firefighter also related that he and others "were packing up [Criner's] belongings" to help get him out of the building, that there were too many items for Criner to take to the shelter, and that the firefighter stored some of the belongings in a gray trash can and placed the trash can at the bottom of an exterior staircase because that was an "out-of-the-way" location. When discussing why he stored the items there, the firefighter explained that he wanted to give Criner the opportunity to retrieve the items later and to conceal the items from people passing by. However, the firefighter also stated that the trash can was accessible to anyone who walked by, that the stairs were not blocked, that the stairwell was an open space, and that the stairs did not have a gate. Two of the policers officers who responded to the 911 call testified that Criner did not have permission to be there and that the owner of the Medical Arts building wanted Criner to leave. One of the officers also explained that it was the

11

intent of the police officers and the firefighters that Criner be able to come back to collect the items that were placed outside in the trash can.

Finally, the police officer who went to the Medical Arts building as part of the investigation in this case testified that he did not have a search warrant, that the trash can at the bottom of the stairs did not appear to have been tampered with, that the trash can was not visible from the street, that he saw the trash can "rather easily" when he approached the front door of the building, and that anyone walking past the front door or between the building and a neighboring building could have seen the trash can. In addition, the officer explained that he searched the trash can for evidence relating to the death of H.W. and seized multiple items.

After considering the testimony above and the parties' arguments, the district court denied the motion to suppress. Following trial, the district court issued findings of fact and conclusions of law pertaining to its ruling. Specifically, the court made, among others, the following findings:

- [Criner] was a homeless juvenile.

- [The owner] asked that Criner be removed from the building.

- The officers informed Criner that he would have to leave.

- [Criner] was allowed to select items to take to Lifeworks and was permitted to store the remainder of his belongings in a large gray plastic trash can.

- The trash[]can was placed at the bottom of an exterior stairwell leading to the basement of the building . . . to make it possible for Criner to return to the location and recover the property.

- The location at the bottom of the stairwell was selected to shield the trash[]can from view.

- [The police] searched . . . the trash[]can.

12

- A number of items of potential evidence were seized.

- At no time did the officers seek or receive a search warrant.

Those findings are supported by the record as summarized above. In addition to those findings, the district court made, among others, the following conclusions of law:

- By walking down the stairwell . . . for the purpose of examining the contents of the trash[]can, [the police] trespassed the curtilage of the property.

- Because there is no applicable exception to the warrant requirement, the evidence should be suppressed if Criner has established standing regarding the trash[]can.

- The evidence indicates the trash[]can was in a location accessible to the public.

- Criner had no ownership or possessory interest in the realty.

- [Criner] had no control over the area and no ability or authority to exclude others.

- While Criner had taken some steps to [e]nsure the privacy of the trash[]can, those steps were minimal.

- Criner's claim is not consistent with historical claims of privacy.

- Criner has failed to establish standing [under the Fourth Amendment].

On appeal, Criner contends that the district court erred when it denied his motion to suppress the evidence pertaining to the items in the trash can. When challenging the district court's ruling, Criner points to the portions of the district court's conclusions of law in which the court determined that the search of the trash can and the seizure of the items inside violated the Fourth Amendment because the police trespassed on the curtilage of the property before seizing the items without a warrant. Further, Criner contends that the district court correctly determined that because the evidence was obtained in violation of the Fourth Amendment, the evidence

should not be admitted under article 38.23 of the Code of Criminal Procedure if he had standing to challenge the search and seizure. *See* Tex. Code Crim. Proc. art. 38.23.

However, Criner argues that the district court's ultimate decision to deny the motion to suppress on the ground that he lacked standing to contest the search and seizure was erroneous and asserts that he had standing because he had "a reasonable expectation of privacy in the trash[]can." Additionally, although Criner recognizes in his brief that the items were found in a trash can and that individuals who abandon their property do not have standing to contest the reasonableness of a search and seizure of the abandoned property, *see Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003), he urges that he did not abandon his property because he did not voluntarily relinquish his interest in his property and instead left the items behind at the directives of the firefighters and police officers who responded to the Medical Arts building, *cf. Matthews v. State*, 431 S.W.3d 596, 609 (Tex. Crim. App. 2014) (explaining that "[a]bandonment is not voluntary if it is the product of police misconduct"). As support for his arguments, Criner points to portions of the testimony from the firefighters and police officers set out earlier indicating that they stored his property in a trash can with the intent to allow him to claim the items later and that they tried to conceal the items by placing the trash can at the bottom of the outside stairwell. For these reasons, Criner insists that he did not abandon the property, that he had a reasonable expectation of privacy, that the warrantless search of the trash can violated his Fourth Amendment rights, and that the evidence should have been excluded under article 38.23 of the Code of Criminal Procedure.[2]

---

[2] At the conclusion of his first issue on appeal, Criner asserts that the warrantless search also violated his rights under section 9 of article I of the Texas Constitution. *See* Tex. Const. art. I, § 9. However, it appears from our review of the record that Criner did not present any argument regarding the Texas Constitution to the district court when arguing that the evidence regarding

14

As set out above, several firefighters and police officers testified that there was furniture, a firepit, and other personal belongings located inside the Medical Arts building even though it was being renovated. Further, the firefighters and police officers stated that when Criner was told to leave and to gather the items that he wanted to take with him, efforts were made to secure the remainder of his belongings from public view and to allow him the opportunity to retrieve those items later. In light of this testimony and the district court's findings, the district court reasonably determined that there was some evidence of a subjective expectation of privacy because Criner had taken "minimal" steps to ensure the privacy of his items, and the district court could have also reasonably determined that Criner had used the building and surrounding property for private use.

However, the firefighters and police officers also testified that Criner was discovered in a vacant building that was under construction, that Criner admitted that he was homeless, and that the owner of the property wanted Criner to leave and had not given him

items seized from the Medical Arts building should be suppressed. *See* Tex. R. App. P. 33.1(a) (stating that to preserve error for appeal, record must show that complaint was made to trial court and that trial court ruled on request or refused to rule and that "complaining party objected to the refusal"); *Rothstein v. State*, 267 S.W.3d 366, 373-74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (determining that defendant did not preserve issue for appeal where his argument did not comport with objection raised in motion to suppress or at suppression hearing). In any event, Criner does not assert on appeal that the Texas Constitution provides any greater protection than the Fourth Amendment in this context or requires a lesser showing to establish standing. *Cf. Garza v. State*, 137 S.W.3d 878, 884, 885 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (noting that Fourth Amendment and section 9 of article I of the Texas Constitution both protect individuals from unreasonable searches and seizures and that, in general, Texas provision "does not offer greater protection against unreasonable searches and seizures than does the Fourth Amendment"); *State v. Hancock*, Nos. 03-98-00634-CR, -00672-CR, -00697-CR, 2000 WL 64061, at *4 (Tex. App.—Austin Jan. 27, 2000, no pet.) (op., not designated for publication) (noting that discussion on standing under Fourth Amendment "is equally applicable to a claim under article I, section 9 of the Texas Constitution"). Accordingly, we limit our analysis to Criner's arguments regarding the Fourth Amendment and article 38.23 of the Code of Criminal Procedure that Criner presented to the district court and that he relies on in the remainder of his appellate briefing on this issue.

permission to be there. In light of the testimony given at trial and the district court's findings, the district court reasonably determined that Criner had no ownership or possessory interest in the building and the property surrounding the building, that he had no ability to exclude others from or exert control over the property, and that his standing claims were not consistent with historical principles of privacy, and the district court could have also reasonably concluded that Criner was not legitimately on the property that was searched. *See State v. Beckman*, No. 04-12-00405-CR, 2013 WL 2445039, at *2 (Tex. App.—San Antonio June 5, 2013, no pet.) (mem. op., not designated for publication) (explaining that "a trespasser generally does not have a reasonable expectation of privacy on property upon which he has trespassed, and therefore lacks standing to challenge the legality of governmental search or seizure thereon"); *Welch v. State*, No. 03-99-00388-CR, 2000 WL 45546, at *2 (Tex. App.—Austin Jan. 21, 2000, no pet.) (op., not designated for publication) (noting that "a citizen can have no reasonable expectation of privacy and Fourth Amendment protection on property where he is a trespasser"); *Douglas v. State*, 695 S.W.2d 817, 819, 820 (Tex. App.—Waco 1985, pet. ref'd) (determining that defendant could not complain regarding warrantless search and seizure of items found in vacant home where defendant was staying "because the evidence showed that [the defendant] was a trespasser on the premises where the search and seizure occurred").

Based on the preceding, the district court did not abuse its discretion by concluding that Criner did not have standing to challenge the search and seizure under the Fourth Amendment because he did not have an objectively reasonable expectation of privacy. *See Hollis v. State*, 219 S.W.3d 446, 457, 458 (Tex. App.—Austin 2007, no pet.) (explaining that "[a]n accused lacks standing to challenge the admission of evidence obtained by searching an area in which he or she does not have a legitimate expectation of privacy" and determining that accused

16

did not have standing to challenge search of dance hall owned by another party); *Granados*, 85 S.W.3d at 226 (determining that although defendant kept "his belongings in the apartment," established "phone service in his name," took normal precautions to protect property by locking door, and "put the place to some private use," he did not have reasonable expectation of privacy and did not have standing to challenge search of apartment because he "had no other property or possessory interest in the apartment," "because he had been asked to leave," because "he was not legitimately in the apartment when the search occurred," because he did not have dominion over the apartment with the right to exclude others," and because "his claim is not consistent with historical notions of privacy"). Because Criner's appellate arguments regarding article 38.23 of the Code of Criminal Procedure are premised on his ability to establish a Fourth Amendment violation, we must also conclude that the district court did not abuse its discretion by determining that evidence pertaining to the items taken from the trash can did not need to be excluded under article 38.23. *See* Tex. Code Crim. Proc. art. 38.23; *see also State v. Sepeda*, 349 S.W.3d 713, 714, 717 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (explaining that defendant "failed to establish any state or federal constitution[al] privacy interest" in parking garage that was searched by police and did not meet burden of showing standing to object to search and that "article 38.23(a) does not confer third-party standing to persons accused of crimes, such that they may complain about the receipt of evidence that was obtained by violation of the rights of others"); *Watson v. State*, 10 S.W.3d 782, 784 (Tex. App.—Austin 2000, no pet.) (concluding that defendant "lacks standing to complain that the evidence against him was unlawfully obtained" under article 38.23 when police "did not violate appellant's rights").[3]

---

[3] When making its findings and conclusions, the district court stated that Criner argued that the evidence should have been suppressed because the police violated a statute by

17

For all of these reasons, we overrule Criner's first issue on appeal.

## Constitutionality of Mandatory Sentence

In his second issue on appeal, Criner challenges the constitutionality of the statutory scheme imposing a mandatory punishment for juvenile offenders who have committed a capital felony. Subsection 12.31(a) sets out the punishment options for an individual "adjudged guilty of a capital murder in a case in which the state does not seek the death penalty" and explains that the punishment options are as follows:

(1) life, if the individual committed the offense when younger than 18 years of age; or

(2) life without parole, if the individual committed the offense when 18 years of age or older.

---

trespassing when the seizure occurred but concluded that Criner did not have standing to pursue that challenge because his rights were not violated by the trespass. On appeal, Criner presumably summarizes that portion of the district court's order by briefly stating, in his words, that "when the detective walked down the stairwell for the purpose of examining the contents of the trash[]can, he trespassed on the curtilage of the property and then searched the trash[]can and seized the contents of the trash[]can without a warrant" and that "[t]he trial court found that this too was a violation of the Fourth Amendment and the relevant portions of Texas law." However, Criner does not further address the district court's determination that the police trespassed onto the property, argue in light of this alleged trespass that the district court should have excluded the evidence under article 38.23 of the Code of Criminal Procedure because the evidence was obtained in violation of a statute, or address whether he would have standing to challenge the search and seizure on that basis. *See* Tex. Code Crim. Proc. art. 38.23. On the contrary, the analysis portion of this issue addresses whether Criner had standing to challenge the search of the trash can and seizure of the property under the Fourth Amendment and whether he abandoned the property at issue, and Criner only mentions article 38.23 once in the argument section of this issue in the concluding paragraph and immediately after asserting that the warrantless search and seizure at issue violated the Fourth Amendment. Accordingly, we do not address the district court's determinations regarding whether the police violated a statute by allegedly trespassing onto the property and whether Criner had standing to assert that the evidence should have been excluded under article 38.23 due to the alleged trespass. *See* Tex. R. App. P. 38.1(i); *see also Chavez v. State*, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000) (deciding that defendant did not have standing under article 38.23 "to complain about the seizure of the" evidence because property was not obtained "in violation of [the defendant]'s rights").

18

Tex. Penal Code § 12.31(a). Accordingly, for juvenile offenders, the Penal Code allows for the possibility of parole, *see id.*, and subsection 508.145(b) of the Government Code states that juvenile inmates serving a life sentence for a capital murder are "not eligible for release on parole until the actual calendar time the inmate has served, without consideration of good conduct time, equals 40 calendar years," Tex. Gov't Code § 508.145(b). In light of those statutory provisions, Criner argues that "an automatic sentence of life with the possibility of parole after 40 years imprisonment for a juvenile offender convicted of capital murder violates the Eighth Amendment of the United States Constitution," which prohibits the imposition of "cruel and unusual punishments," *see* U.S. Const. amend. VIII. When presenting this issue on appeal, Criner contends that the statutory scheme is facially unconstitutional, but he also seems to argue that the statutory scheme is unconstitutional as it was applied to him because the statutory scheme did not allow for the consideration of the mitigating evidence that he presented regarding his "multiple and severe mental health issues" and, accordingly, because it did not allow the district court to conduct "an individualized sentencing hearing."[4]

A determination regarding whether a statute is facially unconstitutional is a question of law subject to de novo review. *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App.

---

[4] In its appellee's brief, the State asserts that Criner did not preserve his constitutional complaints because he "did not challenge the constitutionality of the sentencing scheme at sentencing[] or in a motion for new trial." Although the State recognizes that Criner challenged the constitutionality of the punishment scheme in a motion filed before he was convicted, the State contends that this was insufficient to preserve the issue because "the constitutionality of" his statutorily-imposed punishment was a hypothetical issue until he was convicted. We disagree. In his motion, Criner requested that the district court conduct an individualized sentencing hearing if he was convicted, summarized relevant case law, and argued that the automatic sentencing scheme under which he would be sentenced violated the Eighth Amendment under the analysis from that case law. After reviewing the motion, the district court ruled on the motion by denying it. Accordingly, we conclude that Criner preserved his complaint for appellate consideration. *See* Tex. R. App. P. 33.1(a) (setting out procedure for preserving complaint for appellate review).

2013). A facial challenge is essentially "a claim that 'the statute, by its terms, always operates unconstitutionally.'" *Lebo v. State*, 474 S.W.3d 402, 405 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Gillenwaters v. State*, 205 S.W.3d 534, 536 n.2 (Tex. Crim. App. 2006)). When assessing a statute's constitutionality, reviewing courts "presume that the statute is valid and that the legislature has not acted unreasonably or arbitrarily" when enacting the statute. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). Moreover, the party presenting the statutory challenge has the burden of establishing that the statute is unconstitutional. *Id.* For as-applied challenges, appellate courts review the constitutionality of a criminal statute under a de novo standard of review. *Modarresi v. State*, 488 S.W.3d 455, 465 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (setting out standard for as-applied challenge). When presenting an as-applied challenge, a defendant "concedes the general constitutionality of the statute but asserts it is unconstitutional as applied to her particular facts and circumstances." *Id.* "The burden rests on appellant to establish the statute's unconstitutionality as applied to him." *Eugene v. State*, 528 S.W.3d 245, 249 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

As support for his arguments that the statutory scheme is unconstitutional, Criner refers to an opinion by the Supreme Court. *See Miller v. Alabama*, 567 U.S. 460 (2012). In *Miller*, the Supreme Court determined "that mandatory life *without* parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id.* at 465 (emphasis added). Further, the Supreme Court explained that statutory schemes imposing life imprisonment without the possibility of parole prevent "those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,'" *id.* (quoting *Graham v. Florida*, 560 U.S. 48, 68, 74 (2010)), and pose "too great a risk of disproportionate punishment" "[b]y making youth (and all that accompanies it) irrelevant

to imposition of that harshest prison sentence," *id.* at 479; *see also id.* at 477 (noting that hallmark features of youth include "immaturity, impetuosity, and failure to appreciate risks and consequences"). Moreover, the Supreme Court explained that these types of punishment schemes do not allow consideration of the defendant's "family and home environment . . . no matter how brutal or dysfunctional," of "the circumstances of the homicide offense," or of "the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

Although the Supreme Court concluded that statutes that automatically assess a juvenile's sentence at life without the possibility of parole are unconstitutional, the Supreme Court has not made a similar determination regarding a statutory scheme like the one at issue here, which involves the imposition of a mandatory life sentence but with the possibility of parole. *See* Tex. Penal Code § 12.31(a); Tex. Gov't Code § 508.145(b). However, the Court of Criminal Appeals has considered whether the current Texas statutory scheme is constitutional under *Miller. See Lewis v. State*, 428 S.W.3d 860 (Tex. Crim. App. 2014). In *Lewis*, the Court of Criminal Appeals explained that the holding from *Miller* "is narrow" and "does not forbid mandatory sentencing schemes" like the one in Texas, which leaves the possibility of parole and "a route for juvenile offenders to prove that they have changed" while serving a sentence "that the Legislature has deemed appropriate in light of the fact that the juvenile took someone's life under specified circumstances." *Id.* at 863 (citing Tex. Penal Code § 19.03(a)). Similarly, the Court of Criminal Appeals explained that the analysis from *Miller* does not require that "all juvenile offenders" be given "individualized sentencing" and only "requires an individualized hearing . . . when a juvenile can be sentenced to life without the possibility of parole." *Id.*; *see also Turner v. State*, 443 S.W.3d 128, 129 (Tex. Crim. App. 2014) (concluding that defendant

was "not entitled to an individualized sentencing hearing" under *Miller* and was "only entitled to have his sentence reformed from life without parole to life with the possibility of parole").

Following *Miller*, several of the Texas intermediate courts of appeals, including this one, have rejected both facial and as-applied challenges to the statutory scheme imposing mandatory sentences of life with the possibility of parole for juvenile offenders convicted of capital murder. *See McCardle v. State*, 550 S.W.3d 265, 266, 269 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (concluding that juvenile defendant who was sentenced to life with possibility of parole "was not entitled to an individualized punishment hearing under the Eighth Amendment or *Miller*"); *Guzman v. State*, 539 S.W.3d 394, 402-06 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (rejecting facial challenge to subsection 12.31(a)(1) of Penal Code and subsection 508.145(b) of Government Code); *Matthews v. State*, 513 S.W.3d 45, 61 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (overruling defendant's appellate issues asserting that subsection 12.31(a)(1) "is unconstitutional both facially and as applied to him"); *Maxwell v. State*, No. 03-14-00586-CR, 2016 WL 4177233, at *2-3 (Tex. App.—Austin Aug. 3, 2016, no pet.) (mem. op., not designated for publication) (relying on *Miller* and *Lewis* when overruling defendant's claim that his sentence violated Eighth Amendment because he was not given individualized punishment hearing and further rejecting claim that "life imprisonment with the possibility of parole amounts to a 'de facto life sentence'" because rationale from "*Miller* did not require that parole be 'probable,'" only that it "be 'possible'").[5]

---

[5] In his brief, Criner refers to various cases from other states as support for his assertion that the analysis from *Miller* should compel a conclusion that an automatic sentence of life with the possibility of parole violates the Eighth Amendment. *See, e.g.*, *Bear Cloud v. State*, 334 P.3d 132, 141, 142 (Wyo. 2014) (noting that "a juvenile offender sentenced to a lengthy term-of-years sentence will not have" meaningful opportunity to be released and holding that *Miller* requires "sentencing courts to provide an individualized sentencing hearing" where "the aggregate

In light of the prior precedent from the Court of Criminal Appeals and from this Court and of the guiding authority from other Texas intermediate courts of appeals addressing claims like those brought here, we must reject Criner's constitutional challenges to the punishment scheme under which he was sentenced and overrule his second issue on appeal. *See McCardle*, 550 S.W.3d at 269 (explaining that appellate courts are "bound in criminal cases to follow decisions of the Court of Criminal Appeals").

**Clerical Error**

In his third issue on appeal, Criner argues that although his sentence was automatically assessed under subsection 12.31(a)(1), which requires the imposition of life imprisonment with the possibility of parole, *see* Tex. Penal Code § 12.31(a)(1), the district court's judgment of conviction does not specify "that he will be someday eligible for parole." Accordingly, Criner requests that this Court reform the district court's judgment. In its appellee's brief, the State asserts that it "does not oppose reformation of the trial court's judgment to state that [Criner]'s punishment is life with the possibility of parole" because the "record unambiguously reflects that [Criner] was seventeen at the time of the offense" and "would be sentenced to life . . . with the possibility of parole" if convicted.

---

sentences result in the functional equivalent of life without parole"); *Jackson v. Norris*, 426 S.W.3d 906, 910 (Ark. 2013) (determining that reforming sentence to life with possibility of parole "would not allow for consideration of *Miller* evidence"); *State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013) (concluding "that *Miller's* principles are fully applicable to a lengthy term-of-years sentence"). However, those cases did not address the statutory scheme at issue here, and as set out above, the Court of Criminal Appeals has rejected the idea of expanding *Miller* beyond the context of a juvenile sentenced to life without the possibility of parole. *See Lewis v. State*, 428 S.W.3d 860, 863 (Tex. Crim. App. 2014). "When the Court of Criminal Appeals has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation under the dictates of vertical stare decisis." *Mason v. State*, 416 S.W.3d 720, 728 n.10 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

This Court has the authority to modify incorrect judgments when it has the information necessary to do so.  *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993).  In fact, "[a]ppellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record." *Morris v. State*, 496 S.W.3d 833, 836 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)).  Accordingly, we sustain Criner's third issue and modify the district court's judgment of conviction to reflect that he was sentenced to "life with the possibility of parole."

**Motion for New Trial**

In his final issue on appeal, Criner asserts that the district court erred by denying his motion for new trial alleging that he discovered new evidence after trial.[6]

A trial court's denial of a motion for new trial is reviewed under an abuse-of-discretion standard.  *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded by rule on other grounds as stated by State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007).  When performing its review, an appellate court views the evidence in the light most favorable to the trial court's ruling, *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd), and presumes "that all reasonable factual findings that could have been made against the losing party were made against the losing party," *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014).  "At a motion for new trial hearing, the judge

---

[6] In his motion for new trial, Criner alleged other grounds in addition to the one discussed above, but Criner abandoned those additional claims during the hearing on the motion for new trial.

alone determines the credibility of the witnesses." *Id.* "Even if the testimony is not controverted or subject to cross-examination, the trial judge has discretion to disbelieve that testimony." *Id.*

Article 40.001 of the Code of Criminal Procedure states that "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." Tex. Code Crim. Proc. art. 40.001. Newly-discovered evidence satisfies the requirements of the statute if "(1) the newly discovered evidence was unknown or unavailable to the movant at the time of his trial; (2) the movant's failure to discover or obtain the evidence was not due to lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and, (4) the new evidence is probably true and will probably bring about a different result on another trial." *Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002); *see Bautista v. State*, 474 S.W.3d 770, 776 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). "Further, '[m]otions for new trial on grounds of newly discovered evidence are not favored by the courts and are viewed with great caution.'" *Folau v. State*, No. 02-18-00127-CR, 2019 WL 2455613, at *1 (Tex. App.—Fort Worth June 13, 2019, pet. ref'd) (mem. op., not designated for publication) (quoting *Drew v. State*, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987)). "A failure by defendant to establish any of the essential requirements warrants the trial court's denial of a new trial." *Shafer v. State*, 82 S.W.3d 553, 556 (Tex. App.—San Antonio 2002, pet. ref'd).

During the hearing on the motion for new trial, Criner called Matthew Danner as a witness to testify regarding a forensic data recovery that he performed on Criner's Nextbook laptop computer after the trial. In his testimony, Danner explained that he was able to analyze the actual chip from Criner's computer, that he was able to look at the event logs for the day in question, and that there were event logs missing from the report that Fuentes prepared when he

25

examined the chip for the State and that served as the basis for his testimony. Regarding the results of his examination, Danner related that someone logged into the computer around 7:15 p.m., that the individual used the Internet after logging in, that the last "web history item was . . . [at] 7:41 p.m.," that the computer started "having issues" around 7:44 p.m., that the computer entered "a reboot loop" in which "it rebooted three or four times," that there was "a power button press" that occurred four times between "8:45 p.m. and 8:46 p.m.," and that the power button presses did not appear in the report prepared by Fuentes. Further, Danner explained that there was no event log specifying that the lid had been closed at the times that the power button had been pressed, meaning that the laptop computer was open at those times. Next, Danner reported that the last power button press took the computer out of connected standby, that the computer stayed out of connected standby until 9:33 p.m., and that the computer was on with the lid open between 7:15 p.m. and 9:33 p.m. Additionally, Danner testified that a nonhuman object could have triggered the power button and created the event logs even if the computer was in a backpack provided that the computer was open. Finally, Danner related that there was no user activity recorded during the relevant time period other than the Internet activity around 7:41 p.m. and the power button being pressed around 8:45 p.m.

After considering Danner's testimony and the arguments by the parties, the district court determined that the final requirement necessary to entitle Criner to a new trial had not been met because even if the evidence were true, it would not result in a different outcome in a new trial.

On appeal, Criner asserts that the district court abused its discretion by failing to grant his motion for new trial because all of the necessary requirements were met. As support for his assertion that the last requirement was satisfied, Criner points to the testimony presented

26

at trial regarding the times in which the suspect was seen on surveillance footage at the University. Further, Criner highlights the testimony from Danner indicating that Criner's computer was open from 7:15 p.m. to 8:45 p.m. when the power button was pressed multiple times and that the computer remained open and out of standby mode until 9:33 p.m. In light of the preceding, Criner urges that Danner's testimony directly refuted "the State's contention that [Criner] was the individual seen on the surveillance videos riding the bike." More specifically, Criner asserts that even though Danner testified that the computer was open and on between 7:15 p.m. and 9:33 p.m. and even though he stated that the power button on the computer was pressed multiple times starting at 8:45 p.m., the suspect was seen walking or riding his bike at various times between 8:42 p.m. and 9:38 p.m. without any computer being visible. Accordingly, Criner contends that Danner's testimony established that Criner was operating his computer during the relevant times and could not have been the person seen on the various surveillance videos because the "computer could not have been open and being operated by a human if it was in the backpack of the person seen riding the bike on the surveillance footage," and Criner asserts that Danner's testimony "would probably bring about a different result if it was presented in a new trial."

Although Danner testified that the power button was pressed four times around 8:45 p.m., he also explained that the button could have been pressed by an object while in a backpack if the laptop computer was open. Moreover, Danner did not testify that Criner was the individual who actually pushed the button. Additionally, there was no surveillance footage of the suspect at the time that the power button was repeatedly pressed, and therefore, testimony potentially indicating that the button was pressed at that time is not inconsistent with the evidence indicating that Criner was at the University.

27

In addition, although Danner testified that there were event logs showing that the computer was open and on between 7:15 p.m. and 9:33 p.m., Danner did not provide testimony indicating that there was any active use after 7:41 p.m. other than the power button being pressed four times around 8:45 p.m. In fact, Danner explained that the computer entered a reboot loop during a portion of the relevant time. Furthermore, as set out above, Criner elicited testimony similar to that of Danner's through his cross-examination of Fuentes in which Fuentes testified that there was evidence that Criner's computer was in use at various points on the night in question.

More importantly, the evidence presented at trial overwhelmingly linked Criner to the offense in question. For example, the State presented surveillance footage of someone resembling Criner moving around the University near the location where H.W.'s body was found and following an individual wearing dark clothing who crossed a bridge behind the Alumni Center, and a firefighter viewing the footage recognized Criner and the bike from his interaction with Criner at the Medical Arts building. Moreover, testimony was presented establishing that H.W. was walking home around the time that the suspect was seen near the Alumni Center, that she was carrying a blue bag with red straps, that her normal route home took her by the bridge over Waller Creek next to the Alumni Center, and that she was texting with a friend while walking home, and surveillance footage showed that the person walking over the bridge was looking at the screen of an electronic device when the suspect started following the person. Additionally, surveillance footage from a few hours later shows the suspect in possession of a blue bag that he did not previously have when he started following the person wearing dark clothing and walking on a bridge over Waller Creek.

Further, shortly after the offense, Criner was seen in possession of a bike resembling the one depicted on the surveillance footage and a blue bag with red straps, and the

28

eye glasses and the hammer recovered from the scene of the crime resemble those that were seen in Criner's possession earlier. In addition, Criner was in possession of clothing and shoes resembling those worn by H.W. on the night in question, a sweater with her name on a receipt inside a pocket, other objects belonging to H.W. and bearing her name, and straps similar to the one used in the offense and found around her neck. Similarly, Criner was seen in possession of clothing similar to that worn by the suspect on the night in question, and photos taken before the offense also showed him wearing a lime shirt and an orange bandana. DNA testing performed on a hair recovered from Criner's lime shirt excluded as potential contributors 99% of the population but included H.W. and her maternal family members.

Accordingly, even if Danner's testimony is taken as true, his testimony would probably not bring about a different result on another trial, and we therefore conclude that the district court did not abuse its discretion by determining that the last requirement for a new trial was not met and by denying Criner's motion for new trial on that ground. *See Villarreal v. State*, No. 03-06-00033-CR, 2007 WL 700847, at *2 (Tex. App.—Austin Mar. 6, 2007, pet. ref'd) (mem. op., not designated for publication) (determining that trial court did not abuse its discretion by denying motion for new trial where it was "highly unlikely that the new evidence . . . would have probably brought about a different result on another trial").

For these reasons, we overrule Criner's final issue on appeal.

## CONCLUSION

Having sustained Criner's third issue on appeal, we modify the portion of the district court's judgment of conviction setting out his punishment to reflect that he was sentenced

29

to "life with the possibility of parole." Having overruled the remainder of Criner's issues on appeal, we affirm the district court's judgment of conviction as modified.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Modified and, as Modified, Affirmed

Filed: November 15, 2019

Do Not Publish